The next case for argument is 16-2031 Prism Technologies v. T-Mobile. May it please the court, the jury system is one of the most powerful, important components of our judicial system. That's what distinguishes our system from others around the world. But that system, that component, is very fragile. It relies upon the lawyers playing by a set of rules and judges enforcing those rules. In this case, lawyers didn't play by the rules and the judge did not enforce those rules. Can I just ask you a logistic question, not going either way, which is with the validity challenges, the 102 and the 103, were those just affirmative defenses as opposed to counterclaims? Because in the jury verdict, the jury was told if you find no infringement, you don't reach the validity contentions, right? That's correct. So if you have a new trial or if they have actually found infringement, then you would still have been confronted with dealing with the validity contentions. That's correct. A new trial in this case would put validity back on the table because as you said, the verdict form that was submitted by the parties. And were they just affirmative defenses in this case? I believe they were. I can't recall very specifically. That's a big difference because if they were counterclaims, we don't have jurisdiction, do we? Because there wasn't a final judgment. I believe they were affirmative defenses. We'll check on that. Anyway, we will check into that. The two aspects of the attorney misconduct in this case revolved around, one, what was referred to in our briefs as the cellular argument, and two, was the listed testimony from their expert witness. The cellular argument was against the claim construction. The court had construed the claims to say that the client computer device could connect to the internet protocol network either through a wired system or wireless. And the T-Mobile's attorneys actually argued that because the word cellular was not in the actual specification, it was not in the claims, they could not cover cellular networks. They said that throughout the trial. That was against the claim construction. They said that, you mean the attorneys said it or the witnesses said it? Well, the attorneys said it in opening statements and closing statements, and then they, in our case in chief, they directed our witnesses and they kept asking the question, that was the theme, the word cellular is not in your patents. They asked both inventors that. They crossed our expert on the same thing. So they argued it in their opening and closing, and then they brought it forward into a crescendo with their expert, saying because the word cellular is not in the actual specification, these claims cannot cover a cellular network. And you, of course, presumably rebutted that or responded to that in your opening statements and in your examination. We did. We did our best to counter that. We kept arguing to the judge. I think I personally made 40 plus objections saying that they are changing the claim construction because the claim construction did say it could be wireless or wired. And in their opposition brief on page 10, T-Mobile admits that it could cover cellular networks. But in the entirety of the case, they argued just the opposite. So that takes the balance that the jury gets because the jury is not educated in law. That's a real common sense argument. The word cellular is not in the specification of claims. Therefore, it can't cover cellular networks. That's a good common sense argument. But it takes the balance that the jury relies upon and just kind of tilts it. It makes it unfair. So that was an argument that was made from opening to our case in chief and the cross-examination of our witnesses, our experts, and our fact witnesses, and then with their witnesses as well, and then once again in closing. And when you raised those objections with the judge, the judge said? He said, they can't do that. I will give you an instruction. I will instruct the jury. And he said, oh, many times, I will give you an instruction to instruct the jury that these claims do cover wireless and can cover cellular. And that's what we relied on. We kept making the objections. At one time during the cross-examination, the direct examination of their expert, I called a sidebar. It was a very lengthy sidebar. I warned the judge. I said, your honor, they're doing it again. They have their expert witness who's up there going to give alternative claim interpretations, one for validity and one for infringement. He did the old, you know, heads I win, tails you lose argument. And I said, that's improper. You cannot use two different claim instructions, one for validity and one for infringement. And the judge said, you're right, he can't. You give me an instruction, I will read it to the jury. So we count on that. We kept making objections. He told them to be careful. They kept doing it anyway. That's what made this an unfair trial. And then you gave him the instruction and he... He rejected it. Because? I have no idea. It was, there was no reason given. We provide the instruction. You'll see that in our briefing. It was just rejected. It just said they objected to it and he granted their objection and we didn't get the instruction. That was pivotal. You know, the two aspects of their case, you know, one about the cellular argument where they continually said, because the word cellular is not there, it cannot be, we cannot infringe. What's the standard of our review? You're challenging the judge's failure here to give the curative instruction. What's the standard of our review? The standard review for the curative instruction is de novo. This is a question of patent law, which goes to federal circuit law. There was a footnote in the opposition brief saying this should be a circuit law, which would be an abuse of discretion. But as the court is aware, if it's an issue of patent law, anything, a jury instruction to a patent law, it goes to federal circuit law. And the federal circuit law is a de novo review on this. What is our case that says that you review judge's determination with respect to whether curative instruction is necessary, de novo? It's the Solcer case that we cited in our brief. It is, it's not a, it doesn't say a curative instruction, it says an improper jury instruction on patent law. So basically, if you look at an instruction on patent law, it goes to federal circuit law. In that case, it was a... Oh yeah, yeah. No, that's true. I guess, I think this issue is a little different than that issue. We've had cases where the jury instructs and it's, it's a matter of law in terms of what they say. Clearly, that's reviewed de novo, but I think this argument is a bit different. You're right. It is a slight bit different because here it was a failure to give an instruction on claim construction, to give an instruction on claim construction, because that's what he said he would do. He would give us a very specific instruction on the claim construction issue that has been raised. Well, essentially, though, you're challenging his evidentiary determinations and his failure to either grant your objections at the time or try to do something to fix it later, right? That seems to me more of an abuse of discretion. And from that aspect, we are looking at abuse of discretion for not awarding a new trial because there's two standards here. One's for the new trial. Obviously, that's an abuse of discretion standard. We appreciate that, but not giving the curative instruction or giving, failure to give that, we believe would be a de novo review under federal circuit law. I'd like to ask you about the cross appeal, the one-on-one question, even though we haven't heard argument on that. Depending upon how much time you use on your main argument, you may not have much time on the cross appeal. Would you address that, please? Sure. As to why the claim was addressed to abstract concepts? Sure. And I would like to get back to the expert testimony, but I'll answer your question first. Essentially, what the TMO was doing is overgeneralizing the patents. There is no one representative claim in this patent. These patents are very different. The dependent claims offer a lot. These offer concrete solutions to real-world problems. There is, it recites... The judge found there was an abstract idea. The judge defines abstract idea. So we're only dealing with his conclusion as to whether or not there's something inventive here on this abstract idea. So do you agree with that, that this is exclusively a step two, or are you fighting back on the abstract idea? We're pushing back on the abstract idea. We think there's been a subsequent body of case law since he made the determination that further clarifies step one. That would be, if you look at the, you know, everything from McRow to Enfish and all the cases that have come out, and even more recently with the trading technologies case. I think it's made very clear that the abstract idea, that step one, you have to look at the claims in its entirety, and even though the judge found it was an abstract idea, we disagree with that. But on step two, the inventive concept, we do say it show, and he actually made factual findings, which I think is very important here. He looked at expert testimony and other evidence as well. So he made factual finding that this was inventive, that it didn't just recite standard computer language. Actually, it was directed to the technology applications uniquely rooted in the computer technology. It basically allowed the use of an internet protocol network, or the internet as an example, that was not previously known. It was requested by a client, my client, DTN, said we need a solution. So they went through and found a solution to this real world problem. Most software programs are very clever. The client asks for it, and your client provides a solution, but the claims recite moving information around at a very high level using standard computer products. I would disagree with that respectfully, your honor. What it requires is having a unique identifier in a piece of hardware. That's the client computer device. It has a unique identifier that then uses this public network, an untrusted network, to communicate to a series of very specific servers. Those servers have really unique characteristics. How do we know that? Your friend tells us that hardware identifiers can include any number of pre-existing identifiers. You disagree with that? How do we know you're right and he's wrong? Well, you have to look at the finding of facts that the judge found in the district court. We looked at the expert reports. We have this in our briefs. This type of technology was not common back in 1996, 1997. This was a new technology. What was going on at that time was internet was not commercially available until 1995, early 1996. This was a new technology that people did not know how to use. They were using passwords and a human input. This gave me a unique identifier in this hardware on the client computer device was something that was new. The district judge dealt with this issue in basically one paragraph, half page. Not very extensive. He was a very succinct judge. I'll give him that. You mentioned we should look at his findings. I'm looking at them as Judge Lurie is. They're not very extensive. He did rely on the factual underpinnings of the expert declaration and what was put in. This is not just moving data around. This is about authentication, authorization, and access to get this secure information. The system it goes through to do that was not known at the time. If you look at the actual claim elements, especially with the dependent claims, it lists more very specific elements. If you look at anything from 20,000 feet, it looks general. That's what my friends here are doing. They would look at a lit room from 300 yards and Thomas Edison's light bulb looks like a candle. It lights the room. If you look at it from a distance, everything looks general. The Supreme Court warned us about this. This was solving real-world problems rooted in computer technology. Why don't you hold on to your rebuttal. Thank you. One last thing. On the expert testimony, I did find this very troublesome. When their expert got up and testified, their expert got up and gave an alternative view of infringement and validity. That, to me, is something that is very telling of the whole tone of the trial, using two different claim constructions. That in by itself is enough to get a new trial in this case. I'll reserve the rest of my time. Thank you. Chief Judge Prost and may it please the court. This was not a close case, not at all. The evidence of non-infringement was so specific, so overwhelming, and eventually so conceded by plaintiff's own witness that plaintiffs do not even argue on this appeal that the jury verdict was against the weight of the evidence. Under Eighth Circuit law, which applies to the question of whether or not the judge erred in his discretion in not granting a new trial, Eighth Circuit law says that's an extraordinarily deferential standard reserved for miscarriages of justice where the case was close. That was not this case. T-Mobile's trial defenses were focused very specifically on the role of each of the servers in each of its five networks. There was no attorney misconduct of any type. The premise for both questions is a falsehood. There was no misconduct. Now, the supposed misconduct was that we made an argument that by definition, because the word cellular is not in the claims, then we could not infringe. We never made such an argument. It's not there. Now, there's two ways to decide or to prove the point that it's not there. One is to read the whole transcript and see it's not there. The second is to realize that there was never an objection. Counsel points to seven instances in Mr. Kravitz' opening statement where he supposedly went over the line, committed misconduct. Not one objection. They emphasize in both briefs, argument made in closing, not one objection of any sort, of any nature. Compare that to our situation. Didn't he tell us about instances, I think he did, the number seven for whatever reason, and sidebars and the judge agreeing to a curative instruction. This may not be the opening and the closing. This may be what the witnesses say. Well, and certainly in opening and closing, there's no dispute. There was no objection. And I contrast that with our situation where we objected to the issue of whether the sprint jury verdict could come in. We objected before the opening with the judge in a conference on written papers. And after it was over, we objected on misconduct grounds for raising that issue, and we did it with a motion for mistrial on the record. That's preservation. There was no preservation here. Now, he discusses other objections. And Your Honor asked about other objections. If you look at the objections, they were directed to the written description portion of the case. We had a written description argument that focused on the fact that one of ordinary skill in the art, reading the patents, reading the 416 application, because they wanted to take the chain of priority back to 1997, would never have understood that internet access was within the scope of the invention. Was written description in this case? Written description was absolutely in this case. It was a fundamental part of this case until the judge told us that if we won on infringement, and we did 30 for 30, we had 30 infringement questions, all answered non-infringement. And the judge said, then, don't reach the affirmative defenses under 102 and 103. So because of that, but there were witnesses on both sides. Written description was a huge defense. Indeed, had we lost the case, that would probably be the first thing we would be talking about. It would be one of the major points of appeal. But there was no. That's their problem. Their problem is they're upset about how the written description witnesses were questioned. And their problem is that didn't even go to the jury. That has nothing to do with the verdict. Now, Your Honor asked a very important question, which is, what happened when you made objections? Because I'll tell you first, there were no objections through openings and closings. There was never an objection where they articulated the so-called cellular argument. That's not what the objections were. There were objections about the written description portion of the examination. And on those, the judge ruled for us. Page 30 to 31 in the blue brief, they have 10 examples of places where they say we preserved with objections. In the yellow brief, in pages 16 to 17, they say 11 examples. Well, those 11 are the same 10 from the blue brief plus one. Of those 11 examples, 10 of them the objection was overruled. In one instance, the judge sustained an objection. That question was, would you agree that Mr. Gregg, the inventor, was not a person of ordinary skill in the art in 1997? That question has nothing to do with the so-called cellular argument. That was the only sustained objection. Compared to the case they cite, they cite the Willis case four times in their blue brief. The Willis case was a two-and-a-half-day trial. Counsel objected 14 times on the first day. I'm sorry, 18 times on the first day, 34 times on the second day. And every one of those more than 50 objections was sustained. Counsel was admonished over and over again. That never happened here. It never was even an issue in the district court. We have been blindsided on appeal by a claim of misconduct that is outrageous. Why don't we move on to the 101? Yes, sir. The 101 case, Judge Strahm, of course, recognized properly that we're dealing with an abstract idea here. And I won't belabor that point, but the abstract idea is that access to protected resources should be limited to authorized requesters. The testimony of the two inventors at trial confirmed that which the patent specification makes clear. This was about if you have a website and you have Internet content and you want to limit some of the content to people who pay a subscription fee for it, how do you go about doing that? Well, you should find out who they are and you should make sure they paid for it in advance. That's all this is about. That is an old and abstract concept applied to the Internet, and Alice itself from the Supreme Court tells us that's insufficient. The court relied on the Jericho Systems case out of Texas, which was affirmed by this court in Rule 36 disposition. If you look at that case or the ultra-mercial case versus Hulu or the smart flash case, those are all situations in which there was some prerequisite to receiving content. And in all cases, that idea was considered to be abstract and the patent claims were considered to be unpatentable. So Judge Strom said it's abstract, but they get past that because of DDR holdings. DDR holdings does not apply to this case. The problem here of needing to identify someone who requests a protected resource, something of value, before you give them that thing of value, that is not a problem that is in any way inherent to the Internet. If you have ever gone to board a commercial airline, you must first prove your identity with an ID. You must then show a boarding pass to show you are entitled to get on the plane. If you go to a will call window at a theater, you must first prove your identity, then you must show the credit card and prove that you actually paid for the tickets. In all those instances, you're both showing authentication and authorization. This happens in the real non-Internet world and it's happened since time immemorial. Okay, but on step two, as we discussed with your friend, the judge kind of was very abbreviated in his discussion, but he says one, during the mid-1990s, the patents addressed an inventive concept that solved the problem of delivering resources over an untrusted network. Right. Not sure what that, but he did say in addition, he refers to Dr. Lyon and his testimony. Okay, so why is Dr. Lyon's testimony not sufficient to establish that there was some sort of inventive concept under step two? Well, first, this is a pure legal issue and it should be looked at within the four corners of the patent. None of this is set forth in the patent. What Judge Strom specifically said in Appendix 34 is, quote, the claims modify the way the Internet functions to provide secure access over a protected computer resource. Well, nothing in the claims modifies how the Internet functions. And nothing in the claims modify the conventional uses of generic computers. The claims are not directed at improving a computer in any way as a tool. They don't do that. There's no parallel here to EnFish, where you found the self-referential database, which improved on prior relational databases. And so the actual functioning of the computer became better because of the claimed invention. That's not here. Here, what you have is results-oriented, purely functional claims that tell you to do something, authenticate, authorize, and give access, but it doesn't tell you how to do any of those functions. Receiving data at a computer, transmitting that to another computer, and then comparing the received data to your stored data to see if it matches, if there's an authorization, that is absolutely generic conventional uses of componentry. There is nothing specific here whatsoever. You can contrast what you have here with cases such as McRow v. Banday and Amdocs, where there were specific improvements that this court was able to identify and articulate. You've been talking mostly about the method claims. Yes. The other patent has system claims. And again, that might bring up the Bascom concept of an ordered combination. In Bascom, you'll recall it was the filtering device, that prior filtering devices had been either entirely local or centralized. And Bascom showed how by putting the filter in a specific non-conventional location, it improved the functioning of the network or the system. That's not the situation here. Here you have generic authentication servers and generic access servers. Indeed, the access servers here play essentially no role. The definition, the court construction of an access server, is simply software capable of conveying information. An eNodeB, a cell tower pole, that is an access server, according to Dr. Lyon, because it receives a radio signal and it transmits it onto the MME, where the authentication is done. That makes it an access server. To say that a network is now beyond one-on-one challenge because one computer passes information onto another computer, would make a mockery of one-on-one. There is nothing in the system that is set up to show why this system is designed in a way that's different from the past or better than the past or how to set up the system to make it different or better. Clarify the point the question raised earlier. Was the invalidity issue raised as a defense or a counterclaim? 102 and 103 were raised as affirmative defenses. They were actually pleaded as a counterclaim in the answer, but everything merges in at the time of the final pretrial conference. At that conference, they were identified as affirmative defenses. For that reason, the court reached a ruling that they were not to go to the jury. Thomas, one of the other aspects of your cross-appeal is a challenge to the court's determination that this was not an exceptional case. Correct, Your Honor. Now, you're not asking us to vacate the judge's decision. You're asking us to, as I understand it from reading your brief, in effect hold that the judge erred and that you did establish that this was an exceptional case. Correct, and then to send it back for a determination of what the appropriate amount of reasonable attorney's fees would be. We say that for some very simple reasons. Because the ruling here was very brief. He just said, I've considered the record. It's at Appendix 10. He said, I've considered the record. I don't find it an exceptional case. I think that's right. And I think, frankly, that it's very clear. This judge sat through two prior trials. They related to different companies with different systems who put on entirely different defenses. In one of them, in the AT&T case, the company settled during the case, shortly before closings. In the second, there was a jury verdict that was favorable to the plaintiff. Those situations, we had a completely different case than that. We proved, without dispute, how our system works. If you look at DX802, it specifically identifies how the system works. It specifically identifies that the MME does the authentication. These are the 3GPP protocols that govern 3G and 4G LTE. And, indeed, govern 2G, which was pre this case. Authentication in cellular systems has been set up since the early 1990s. SIM cards, as a matter of hardware, has been there since the early 1990s. None of this was new. Nothing here was new. They were trying to apply it against a cellular system in a way that didn't work, didn't fit. And yet, you never asked for summary judgment after you built the court. No, we absolutely didn't. We would not have received summary judgment from this court. He would have said there were disputed fact issues. It took almost eight hours of cross-examination of Dr. Lyon. That's what the other defendants didn't want to do. They count on the fact that they can make a case so complex, they can put a board up that's four feet wide and five feet tall, and they can plaster it full of supposed document numbers and say, look, it all works together. It was a fabrication. It doesn't work that way. We proved it through the standards. We follow the standards, and it wasn't disputed. And if you look at the standards, the very exhibits, I gave you defendants 802. I would say plaintiffs, TX332. They show how the system works in 3G and 4G. The MME authenticates. They admit the MME is an access server, and they stipulated to the claim construction that the access server and the authentication server must be distinct. What's the plaintiff's exhibit number again? The plaintiff's exhibit is TX332. And when all was done, and when all was done, they did two things at the very end of the case. They changed their whole theory of infringement, and they argued that, oh, this is just like checking into a hotel. That's all this is. We're making a big deal out of authentication. It's not. The MME is authentication. Their witness, their witness at appendix 36624, explicitly disclaimed that an MME authenticated. He specifically said it does not during my cross-examination, and then at the end of the trial they said the MME is good enough. It's just like checking into a hotel. And I submit to Your Honor that the example that our invention is like checking into a hotel tells you more about the 101 problems of this case than it tells you anything about the alleged infringement. Thank you, Your Honor. Thank you. I have reserved time, but I say I've used essentially it. You can use it all if your friend reaches the 101, and she will restore it. Thank you, Your Honor. As my friend pointed out, we did have two trials previous to this on very similar systems. And in those trials we got favorable decisions on both of them, favorable outcomes up to this court that they had been affirmed. The difference was the parties played by the rules in those trials. They didn't here. That's what it comes down to. They say they didn't make the cellular argument, but our brief is replete with it. The issue today is we didn't make objections during opening and closing. Now, I kind of have an honorable handshake deal. When you make an opening and closing, these are arguments, not evidence. Were 101 issues in play in those other cases? They were. 101? Yeah, but not on appeal. So it was a joint motion on 101 in which the judge ruled that the patents were patent eligible. With regard to Judge Schall's question about whether the fees should apply here, all reasonable references would be drawn to PRISM, obviously, and look at the totality of circumstances. This is not a case that stands out. Jury trials are closed cases. You're saying we can decide this issue because the judge had a pretty thin opinion on this point, and there does seem to be some law in our court suggesting that there has to be some explanation on the exceptional case exercise of discretion. Well, as this court has found many times, the person who's best suited to judge that is the trial judge. He sat through the trial, and therefore a difference should be given to the judge on that, and this is abuse of discretion. He sat through three trials at that point. One last thing. My friend talked about that they focus on the role of each server. That shows 101 issue that this isn't a concept. There are different roles for each server. Outside the elevators in this building right here, you notice there's a mutual authentication sign. This court's going to. Mutually authenticating your communications. That is what these patents are about as well. This is 20 years ago. These patents are talking about mutual authentication. I'm not saying we're infringing. I'll represent you if you are. That tells you how inventive these patents were. Something this court's going into today, going into mutual authentication. These claims cover. We have mutual authentication. They don't address it. They talk about very high generalization of what the patents cover. It's simple access and authentication. That's not what the patents are about. They're about using this brand-new system, the Internet, in a way that no one had thought of before. That's the inventive concept.  and the judge actually was very specific in his order. He said, The problems addressed by PRISM's claims are ones that arose uniquely in the context of the Internet, and the solutions proposed was a specific method of solving that problem. That's exactly right. Thank you. I have ten seconds. All I need is to say the 101 issue was not in play in the AT&T or the Sprint case. We made a motion. It was made on behalf of ourselves. It is not made on behalf of the two remaining defendants who sit in court waiting to see whether their cases go forward. It was our motion and only our motion. Thank you. Thank you. We thank both sides and the cases submitted.